**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| ADDICTION & DETOXIFICATION INSTITUTE, LLC, a New Jersey Limited Liability Corporation<br><br>Plaintiff,<br><br>v.<br><br>JOHN EPPERLY, an individual, NEW HOPE HOLDINGS, LLC, an Illinois Limited Liability Corporation, MIDWEST RAPID OPIATE DETOXIFICATION SPECIALISTS, LLC, An Illinois Limited Liability Corporation, TEXAS OPIATE DETOXIFICATION SPECIALISTS, LLC, a Texas Limited Liability Corporation, and THOREK MEMORAL HOSPITAL, an Illinois Corporation,<br><br>Defendants. | ) | Civil Action No.<br><br>Judge<br><br>Magistrate<br><br>Demand for Jury Trial |

**COMPLAINT**

Plaintiff, Addiction & Detoxification Institute LLC ("ADI") for its Complaint for Patent Infringement against Defendants John Epperly ("Epperly"), New Hope Holdings, LLC ("New Hope"), Midwest Rapid Opiate Detoxification Specialists, LLC ("MRODS"), Texas Opiate Detoxification Specialists, LLC ("TODS"), and Thorek Memorial Hospital ("Thorek") (collectively, hereafter "Defendants"), alleges as follows:

**PARTIES**

1. Plaintiff ADI is a New Jersey corporation having an address at One South Center Street, Suite 202, Merchantville, New Jersey.

2. On information and belief, Defendant Epperly, an individual, is Chairman of Dependant New Hope which owns and operates Defendants MRODS and TODS, and Epperly has an address at 309 Hamilton Street #B, Geneva, Illinois 60134-2182.

3. On information and belief, Defendant New Hope is an Illinois Limited Liability Corporation having an address at 309 Hamilton Street #B, Geneva, Illinois 60134-2182.

4. On information and belief, Defendant MRODS is an Illinois Limited Liability Corporation which is owned and operated by Defendant New Hope and has addresses of 2835 N. Sheffield Ave., Suite 407, Chicago, Illinois 60657 and 309 Hamilton Street #B, Geneva, Illinois 60134-2182.

5. On information and belief, Defendant TODS is a Texas Limited Liability Corporation, which is owned and operated by Defendant New Hope, and has addresses of 309 Hamilton Street #B, Geneva, Illinois 60134-2182 and Kindred Hospital, 1802 Highway 157 N, Mansfield, Texas 76063.

6. On information and belief, Defendant Thorek is an Illinois Corporation having an address at 850 W. Irving Park Road, Chicago, Illinois 60613-3099.

7. On information and belief, Defendants are engaged in the operation, use, sale, and offering for sale within the United States of opiate detoxification services and methods, including, but not limited to, Anesthesia Assisted Rapid Opiate Detoxification ("AAROD"), also known as "Rapid Detox," "Rapid Opiate Detox," and "Ultra Rapid Opiate Detoxification (UROD)."

## JURISDICTION AND VENUE

8. This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1391(b), 1391(c), 1391(d), and 1400(b).

10. On information and belief, Defendants are subject to personal jurisdiction in the Northern District of Illinois, Eastern Division (the "District"), consistent with the principles of due process, because Defendants maintain offices and facilities in this District, offer their products, services, and methods for sale, and do sell same, in this District, have transacted business in this district, have committed and/or contributed to and/or induced acts of patent infringement in this District.

11. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c), 1391(d), and 1400(b).

## PATENT INFRINGEMENT COUNTS

12. ADI is the owner of all right, title, and interest in U.S. Patent No. 5,789,411 (the "'411 patent") and in U.S. Patent No. 6,004,962 (the "'962 patent") (collectively the "ADI Patents"), which Defendants are infringing and/or are contributorially infringing and/or are inducing others to infringe by using, offering to sell, and/or selling methods and services that practice one or more inventions claimed in the ADI Patents.

13. Defendants have profited through infringement of the ADI Patents. As a result of Defendants' unlawful infringement of the ADI Patents, ADI has suffered and will continue to suffer damage. ADI is entitled to recover from Defendants the damages suffered by ADI as a result of Defendants' unlawful acts.

14. On information and belief, Defendants' infringement of one or more of the ADI Patents is willful and deliberate, entitling ADI to enhanced damages and reasonable attorneys fees and costs.

15. On information and belief, Defendants intent to continue their unlawful infringing activity, and ADI continues to and will continue to suffer irreparable harm, for which there is no adequate remedy at law, from such unlawful infringing activity unless Defendants are enjoined by this Court.

**COUNT I**

**INFRINGEMENT OF U.S. PATENT NO. 5,789,411**

16. ADI realleges and incorporates by reference the allegations set forth in paragraphs 1-15.

17. ADI is the owner of all right, title, and interest in the '411 Patent, entitled "Improvements to Rapid Opiate Detoxification," duly and properly issued by the U.S. Patent and Trademark Office on August 4, 1998. A copy of the '411 Patent is attached as Exhibit A.

18. Defendants have been and/or are directly infringing and/or inducing infringement of and/or contributorially infringing the '411 Patent by, among other things, using, selling, offering to sell in the United States methods and services that are covered by at least one claim of the '411 Patent.

**COUNT II**

**INFRINGMENT OF U.S. PATENT NO. 6,004,962**

19. ADI realleges and incorporates by reference the allegations set forth in paragraphs 1-18.

20. ADI is the owner of all right, title and interest in the '962 Patent entitled "Rapid Opiod Detoxification," duly and properly issued by the U.S. Patent and Trademark Office on March 30, 1999. A copy of the '962 Patent is attached as Exhibit B.

21. Defendants have been and/or are directly infringing and/or are inducing infringement of and/or contributorily infringing the '962 Patent by, among other things, using, selling, offering to sell in the United States methods and services that are covered by at least one claim of the '962 Patent.

## DEMAND FOR JURY TRIAL

22. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, ADI respectfully requests a trial by jury of all issues properly triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, ADI prays for relief as follows:

A. For a judgment declaring that Defendants have infringed each of the ADI Patents;

B. For a judgment awarding ADI compensatory damages as a result of Defendants' infringement of the ADI Patents and in no even less than a reasonable royalty;

C. For a judgment declaring that Defendants' infringement of the ADI Patents has been willful and deliberate;

D. For a judgment awarding ADI treble damages and pre-judgment interest under 35 U.S.C. § 284 as a result of Defendants' willful and deliberate infringement of the ADI Patents;

E. For a judgment declaring that this case is exceptional and awarding ADI its expenses, costs, and attorneys' fees in accordance with 35 U.S.C. §§ 284 and 285 and Rule 54 of the Federal Rules of Civil Procedure;

F. For a grant of a permanent injunction pursuant to 35 U.S.C. §§ 283, enjoining the Defendants from further acts of infringement; and

G. For such other and further relief as the Court deems just and proper.

DATED THIS ___ DAY OF ______ 2011.

**PLAINTIFF ADDICTION & DETOXIFICATION INSTITUTE, LLC**

Respectfully submitted,

Date____________________

By__________________________
John P. Luther

John P. Luther
Ladas & Parry LLP
224 South Michigan Avenue
Suite 1600
Chicago, IL 60604
312-427-1300 phone
312-427-6663 fax
JLuther@Ladas.net

# CIVIL COVER SHEET

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**(a) PLAINTIFFS**
Addiction and Detoxification Institute, LLC

**DEFENDANTS**
John Epperly, New Hope Holdings, LLC, Midwest Rapid Opiate Detoxification Specialists, LLC, Texas Opiate Detoxification Specialists, LLC, Thoreck Memorial Hospital

**(b)** County of Residence of First Listed Plaintiff ______
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ______
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
John P. Luther, Ladas & Parry, 224 S. Michigan Ave., Ste. 1600, Chicago, IL 60604
and
Thomas K. Mirabile, 1751 S. Naperville Rd., Ste. 203, Wheaton, IL 60187

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (excl. vet.)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Inj.

PERSONAL INJURY
☐ 362 Personal Injury—Med. Malpractice
☐ 365 Personal Injury — Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☒ 830 Patent
☐ 840 Trademark

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Security/Commodity/Exch.
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 ADA—Employment
☐ 446 ADA — Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.

## VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter perviously adjudicated by a judge of this Court. Use a separate attachment if necessary)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**IX. This case** ☒ **is not a refiling of a previously dismissed action.**
☐ **is a refiling of case number** ______ **, previously dismissed by Judge** ______

DATE 08/29/2011 SIGNATURE OF ATTORNEY OF RECORD [signature]

**U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**
**ATTORNEY APPEARANCE FORM**

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

In the Matter of

ADDICTION & DETOXIFICATION INSTITUTE, LLC
Plaintiff,
v.
JOHN EPPERLY, et. al.
Defendants.

Case Number: 11cv5947

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

ADDICTION & DETOXIFICATION INSTITUTE, LLC
Plaintiff

| | |
|---|---|
| NAME (Type or print)<br>John P. Luther | |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically)<br>s/ John P. Luther | |
| FIRM<br>Ladas & Parry LLP | |
| STREET ADDRESS<br>224 S. Michigan Ave., Suite 1600 | |
| CITY/STATE/ZIP<br>Chicago, IL 60604 | |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) | TELEPHONE NUMBER<br>312-427-1300 |
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? | YES ☑ NO ☐ |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? | YES ☐ NO ☑ |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? | YES ☑ NO ☐ |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? | YES ☑ NO ☐ |
| IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.<br>RETAINED COUNSEL ☐ APPOINTED COUNSEL ☐ | |

**U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**
**ATTORNEY APPEARANCE FORM**

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

---

In the Matter of — Case Number: 11cv5947

ADDRESSION & DETOXIFICATION INSTITUTE, LLC
Plaintiff,
v.
JOHN EPPERLY, et. al.
Defendants.

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

ADDICTION & DETOXIFICATION INSTITUTE, LLC
Plaintiff

| | |
|---|---|
| NAME (Type or print)<br>Thomas K. Mirabile | |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically)<br>s/ Thomas K. Mirabile | |
| FIRM<br>Mirabile Law Firm | |
| STREET ADDRESS<br>1751 S. Naperville Rd, Suite 203 | |
| CITY/STATE/ZIP<br>Wheaton, IL 60187 | |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS)<br>1927728 | TELEPHONE NUMBER<br>630-665-6904 |

| Question | YES | NO |
|---|---|---|
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? | ☐ | ☑ |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? | ☑ | ☐ |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? | ☑ | ☐ |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? | ☑ | ☐ |

IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.

RETAINED COUNSEL ☐ APPOINTED COUNSEL ☐

# EXHIBIT A

US006004962A

# United States Patent [19]

Gooberman

[11] **Patent Number: 6,004,962**

[45] **Date of Patent: Dec. 21, 1999**

[54] **RAPID OPIOID DETOXIFICATION**

[76] Inventor: **Lance L. Gooberman**, 35 Gill Rd., Haddonfield, N.J. 08033

[ * ] Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

[21] Appl. No.: **08/526,429**

[22] Filed: **Sep. 11, 1995**

[51] **Int. Cl.**[6] ........................ **A61K 31/44**; A61K 31/495

[52] **U.S. Cl.** ........................ **514/255**; 514/282; 514/812

[58] **Field of Search** ........................ 514/282, 255, 514/812

[56] **References Cited**

U.S. PATENT DOCUMENTS

5,272,149 12/1993 Stalling ........................ 514/255

OTHER PUBLICATIONS

Barbara H. Herman, Ph.D., Director, Clinical Opioid Medications Program (COMP), Clinical Trials Branch (CTB), MDD, NIDA, NIH and Dorynne Czechowicz, M.D., Treatment Research Branch (TRB), DCSR, NIDA, NIH; NIDA Scientifice Report of Ultra Rapid Detoxification with Anethesia (UROD): Opinion of the Consultants and Criteria Relating to Evaluating the Safety and Efficacy of UROD.

Affidavit of Juan Jose Legarda, 1995.

Affidavit of Norbert Loimer, 1995.

Alim, T.N. et al., "Tolerability Study of a Depot Form of Naltrexone Substance Abusers", *Problems of Drug Dependence, 1994: Proceedings of the 56th Annual Scientific Meeting, The College on Problems of Drug Dependence, Inc.*, vol. II: Abstracts, NIDA Research Monograph 153, p. 253, U.S. Department of Health and Human Services, National Institute on Drug Abuse, Rockville, MD, 1995.

Chiang, C.N. et al., "Kinetics of a Naltrexone Sustained–Release Preparation", *Clin. Pharmacol. Ther.*, vol. 36, No. 5, pp. 704–708, Nov. 1984.

Wall, Monroe E. et al., "Metabolism and Disposition of Naltrexone in Man After Oral and Intravenous Administration", *Metabolism and Disposition*, vol. 9, No. 4, pp. 369–375, 1981.

Renault, Pierre F., "Treatment of Heroin–Dependent Persons With Antagonists: Current Status", *Naltrexone: Research Monograph 28*, pp. 11–22, National Institute on Drug Abuse, 1980.

Wall, Monroe E. et al., "Naltrexone Disposition in Man After Subcutaneous Administration", *Metabolism and Disposition*, vol. 12, No. 6, pp. 677, 679 & 682, 1984.

Reuning, R.H. et al., "Pharmacokinetic Quantitation of Naltrexone Controlled Release From a Copolymer Delivery System", *Journal of Pharmacokinetics and Biopharmaceutics*, vol. 11, No. 4, pp. 369–387, Plenum Publishing Corporation, 1983.

Sharon, A. Carl et al., "Development of Drug Delivery Systems for Use in Treatment of Narcotic Addiction", *Naltrexone: Research Monograph 28*, pp. 194–213, National Institute on Drug Abuse, 1980.

Misra, Anand L., "Current Status of Preclinical Research on Disposition, Pharmacokinetics, and Metabolism of Naltrexone", *Naltrexone: Research Monograph 28*, pp. 132–146, National Institute on Drug Abuse, 1980.

Harrigan, Stephen E., "Pharmacological Evaluation of Narcotic Antagonist Delivery Systems in Rhesus Monkeys", *Naltrexone: Research Monograph 28*, pp. 77–92, National Institute on Drug Abuse, 1980.

Forrester–Sigma, Patrick et al., "A New Assault On Addiction", *Newsweek*, Jan. 30, 1995.

Loimer, Norbert et al., "Combined Naloxone/Methadone Preparations for Opiate Substitution Therapy", *Journal of Substance Abuse Treatment*, vol. 8, pp. 157–160, 1991.

Loimer, Norbert et al., "Similar Efficacy of Abrupt and Gradual Opiate Detoxification", *American Journal of Drug and Alcohol Abuse*, 17(3), pp. 307–312, 1991.

Bastin, Richard, "New drug cure gives addicts painless cold turkey", Reuters, Limited, 1994.

Abstract of O'Connor, PG et al., "Ambulatory opiate detoxification and primary care", *J. Gen. Intern. Med.*, 7(5): 532–4, Sep.–Oct. 1992.

Abstract of Senft, RA, "Experience with clonidine–naltrexone for rapid opiate detoxification", *J. Subst. Abuse Treat.*, 8(4) ;257–9, 1991.

Abstract of Fraser, AD, "Clinical toxicology of drugs used in the treatment of opiate dependency", *Clin. Lab. Med.*, 10(2) :375–86, Jun. 1990.

Nutt, David J., "Pharmacological Mechanism of Benzodiazepine Withdrawal", The Reckitt and Colman Psycopharmacology Unit, The Medical School, Bristol, England, undated.

Article entitled "Is RO 15–4513 A Specific Alcohol Antagonist", undated.

Jordan, C. et al., Respiratory Depression Following Diazepam: (Reversal with High–Dose Naloxone), *The American Society of Anesthesiologists, Inc.*, 53:293–298, 1980.

Loimer, Norbert et al., "Technique for Greatly Shortening The Transition From Methadone To Naltrexone Maintenance of Patients Addicted to Opiates", *American Journal of Psychiatry*, Clinical and Research Reports 148–7, pp. 993–935, Jul. 1991.

(List continued on next page.)

*Primary Examiner*—James H. Reamer
*Attorney, Agent, or Firm*—Lerner, David, Littenberg, Krumholz & Mentlik, LLP

[57] **ABSTRACT**

Rapid opioid detoxification procedures are provided which include sedating a patient with a rapid-acting, safely reversible intravenous anesthetic agent having a very short full recovery period. The patient is administered an opioid antagonist while sedated and can be revived to an ambulatory condition within eight hours of initiating therapy. The described methods for detoxification can be used with dually-addicted patients who have abused opiates, such as heroin, as well as benzodiazepines. Even with these dually-addicted patients, the process is completely reversible early on in the procedure if any adverse complications arise.

**8 Claims, No Drawings**

OTHER PUBLICATIONS

Loimer, N. et al., "Continuous Naloxone Administration Suppresses Opiate Withdrawal Symptoms in Human Opiate Addicts During Detoxification Treatment", *Journal of Psychiatry*, Res. vol. 23, No. 1, pp. 81–86, 1989.
Eisenberg, Richard, "Effects of Chronic Treatment with Diazepam, Phenobarbital, Or Amphetamine on Naloxone–Precipitated Morphine Withdrawal", *Drug and Alcohol Dependence*, 15, pp. 375–381, 1985.
Presslich, Otto et al., "Opiate Detoxification Under General Anesthesia By Large Doses of Naloxone", *Clinical Toxicology*, 27(4&5), pp. 263–270, 1989.
Abstract of U.S. Patent No. 5,173,287 to Smith.
Abstract of U.S. Patent No. 5,075,341 to Mendelson et al.
Abstract of U.S. Patent No. 5,–69,909 to Roos et al.
Abstract of U.S. Patent No. 5,389,670 to Fontana.
Abstract of U.S. Patent No. 5,370,681 to Herweck.
Abstract of U.S. Patent No. 5,316,938 to Keen et al.
Abstract of U.S. Patent No. 5,288,488 to Backman et al.
Abstract of U.S. Patent No. 5,286,718 to Elliott.
Abstract of U.S. Patent No. 5,268,463 to Jefferson.
Abstract of U.S. Patent No. 5,243,094 to Borg.
Abstract of U.S. Patent No. 5,223,605 to Fanslow et al.
Abstract of U.S. Patent No. 5,212,072 to Blalock et al.
Abstract of U.S. Patent No. 5,189,064 to Blum et al.
Abstract of U.S. Patent No. 5,173,486 to Monkovic et al.
Abstract of U.S. Patent No. 5,137,712 to Kask et al.
Abstract of U.S. Patent No. 5,128,145 to Edgren et al.
Abstract of U.S. Patent No. 5,120,543 to Hagin et al.
Abstract of U.S. Patent No. 5,110,364 to Mazur et al.
Abstract of U.S. Patent No. 5,108,927 to Dorn.
Abstract of U.S. Patent No. 5,091,180 to Walker et al.
Abstract of U.S. Patent No. 5,084,377 to Rowan.
Abstract of U.S. Patent No. 5,077,195 to Blalock et al.
Abstract of U.S. Patent No. 5,070,014 to Dorn.
Abstract of U.S. Patent No. 5,057,3231 to Edgren et al.
Abstract of U.S. Patent No. 5,043,163 to Pap et al.
Abstract of U.S. Patent No. 5,034,416 to Smith.
Abstract of U.S. Patent No. 5,026,728 to Kendall et al.
Abstract of U.S. Patent No. 5,021,236 to Gries et al.
Abstract of U.S. Patent No. 5,013,539 to Morris et al.
Abstract of U.S. Patent No. 4,997,454 to Violante et al.
Abstract of U.S. Patent No. 5,952,376 to Peterson.
Abstract of U.S. Patent No. 4,935,428 to Lewis.
Abstract of U.S. Patent No. 4,920,044 to Bretan, Jr.
Abstract of U.S. Patent No. 4,897,246 to Peterson.
Jeffrey, Glenn, "Rapid Opioid Detox with Naltrexone: Its Evolution, Its Neurophysiology and Further Pharmocologic Considerations", pp. 1–51, Cornell University Medical Center, undated.
Legarda, Juan Jose, "A Twenty–four Inpatient Detoxification Treatment for Heroin Addicts: A Preliminary Investigation", *Drug and Alcohol Dependence*, 35, pp. 91–93, 1994.
Letter from Eva Clifton to Lance Gooberman dated May 13, 1995.
Trade Literature from Krakauers Ltd. dated May 14, 1995.

# RAPID OPIOID DETOXIFICATION

## FIELD OF THE INVENTION

This invention relates to methods of rapidly detoxifying opioid addicts so as to relieve conscious symptoms, and more particularly, to methods of detoxification employing sedation and a narcotic antagonist while permitting the patient to be ambulatory within eight hours of beginning treatment.

## BACKGROUND OF THE INVENTION

Heroin addiction is a growing healthcare problem in the United States. The United States Department of Health and Human Services' Substance Abuse Branch issued a report in December of 1994 stating that the number of emergency department visits directly related to heroin use rose from 48,000 in 1992 to 63,000 in 1993, a 31% increase. The rate of heroin-related episodes per 100,000 people rose 81%, from 15 to 28 per 100,000, between 1990 and 1993. Upon breaking down the heroin-using population into ethnic groups and age groups, it has been demonstrated that all subsets have increased rates of use for this time period.

Human opiate detoxification has been in use for some time. More than 31,000 individuals of the Empire Blue Cross and Blue Shield subscriber base in New York were hospitalized at least once for opiate dependency between 1982 and 1992. The majority of these individuals were working adults, and their principal reason for hospitalization was addiction treatment. Drug detoxification accounted for 96% of the admissions, and the length of stay ranged between five and ten days.

It is widely known that heroin addicts fear and loathe heroin detoxification. For the addict, withdrawal can be like having a massive panic attack, an acute case of Huntington's Chorea, a psychological shock syndrome, and a nasty flu, all rolled into one.

Even if we discount the less than warm reception by addicts, the current method of detoxifying an individual from opiates is flawed in several respects. First of all, it is extremely uncomfortable for individual patients. Second, it can take days, and even weeks, for treatment, and this treatment is very expensive when one considers the overall length of stay at a hospital. Third, it is not very effective. Early relapse is the rule rather than the exception.

These results are not surprising. At the end of customary detoxification therapy there remains a considerable amount of opiates on the receptor sites in the brain of the patient. As these opiates diminish, the individual continues to feel uncomfortable and seeks relief by the administration of another dose of opiates. This can be readily appreciated if one attempts to initiate naltrexone oral antagonist therapy immediately after a standard detoxification in an attempt to interfere with the anticipated relapse. The patient promptly experiences considerable discomfort from the displacement of the remaining opiates from the receptor sites.

In the 1980s, outpatient protocols were developed in an attempt to reduce expenses and to entice more addicts to receive treatment. In one particular therapy, a shortened five-day schedule was employed. On the first day, patients received a naloxone hydrochloride ("naloxone") challenge test at 9:00 a.m., using 0.8 mgs of naloxone, and then were started on clonidine hydrochloride ("clonidine") premedication. Clonidine is a potent antihypertensive agent and stimulates adrenergic receptors in the brain, leading to reduced sympathetic nervous system output. Daily averages of medi-



cation were, for day two: clonidine 1.1 mgs and naltrexone 8 mgs; day three: clonidine 0.6 mgs and naltrexone 40 mgs; day four: clonidine 0.3 mgs and naltrexone 50 mgs; and day five: clonidine 0.2 mgs and naltrexone 150 mgs.

In 1990, Loimer et al. described an inpatient technique in which 12 hours after the patient's last dose of opiate, they were sedated with 100 mgs of the barbiturate, methohexitone. This was followed by further injections of 400 mgs of methohexitone and 10 mgs of naloxone. After the narcotic effect had worn off, 2 mgs of naloxone was given intravenously about 30–40 minutes later. This did not elicit any further withdrawal response. This study showed that the acute onset of withdrawal symptoms induced by naloxone in opiate addicts is blocked by barbiturates.

Loimer et al. in 1991 described another inpatient, technique for enabling patients to transfer quickly from methadone to naltrexone maintenance. In a study of seven patients, they induced acute methadone detoxification by using a 4 mg bolus of intravenous naloxone ten minutes after intravenous sedation was started with 30 mgs of midazolam, a short-acting benzodiazepine. After the naloxone infusion was completed, the patients received repeated dosages of flumazenil, a benzodiazepine antagonist, until they were awake. Within hours, the patients tolerated full doses of naltrexone.

Loimer pointed out that conscious sedation with midazolam was safer than general anesthesia. The technique also suppressed withdrawal signs and symptoms. Loimer used intranasal naloxone to induct patients onto naltrexone.

Loimer further described in 1993 an inpatient technique using intranasal naloxone. Twenty opiate-dependent patients reported a mean daily heroin dose of 2.0 grams for at least 2 months prior to detoxification. Twelve hours after their last heroin use, all the patients were sedated with 60 mgs of midazolam. Simultaneously, they received 0.3 mgs of clonidine and 5.0 mgs of ondansetron (a selective 5-HT3 receptor antagonist, generally used to prevent nausea and vomiting associated with cancer chemotherapy). Ten minutes later, oral naltrexone, 50 mgs, was administered. The patients typically were asleep fifteen minutes post-midazolam injection, at which time withdrawal was precipitated by 4 mgs of naloxone administered nasally as a spray. Naltrexone, 50 mgs/day, was continued for the next 2 days before discharge.

Loimer has reported that none of his patients showed severe withdrawal distress before **30** detoxification. He has found that following the administration of naloxone, withdrawal distress was significantly higher than baseline levels at 30, 45, 60 and 90 minutes, but that there were no significant differences from the baseline on all subsequent measurements. Furthermore, he has reported that systolic and diastolic blood pressure and heart rate did not change significantly during treatment.

Legarda and Gossop in 1994 also described an inpatient technique enabling heroin addicts to undergo a rapid transition to naltrexone maintenance, now referred to as rapid opiate detoxification ("ROD"). Legarda belongs to the CITA group, which has been detoxifying heroin patients in Spain, Israel and Mexico under general anesthesia.

As in Loimer et al.'s 1991 report, Legarda and Gossop used intravenous midazolam (0.5–0.7 mgs/kg initially, then as a constant infusion) for sedation. In this study, however, patients received an initial dose of oral naltrexone, 50 mgs, immediately prior to the injection of midazolam, and did not receive any naloxone reversal while under sedation.

They also pretreated the patients with repeated oral doses of guanfacine (like clonidine, a centrally acting agent with

alpha-2 agonist properties) 1–2 mgs/hour. Oral doses of loperamide (4 mgs) and ondansetron (8 mgs) were given, to avoid diarrhea and vomiting during the detoxification procedure.

During the time they were sedated, the subjects' opiate withdrawal signs primarily were piloerection, sneezing and motor agitation.

Four hours after the sleep induction, the patients received a naloxone test (0.8 mgs IV), and then 12 hours later they received 50 mgs of naltrexone, both of which provoked no withdrawal responses.

While Dr. Loimer's initial barbiturate procedure has relieved patients of the conscious symptoms of withdrawal by administering general anesthesia simultaneously with a large continuous dose of a pure narcotic antagonist, he requires patients to be anesthetized for 12 to 24 hours. This is because barbiturate anesthesia tends to accumulate and is not reversible, requiring patients to be monitored for an extended period of time following the procedure. It also minimizes the options available to the physician if adverse conditions arise, such as severe respiratory suppression.

The use of the benzodiazepines, such as midazalom is completely reversible by antagonists such as flumazenil, an imidazobenzodiazepine derivative. Flumazenil competitively inhibits the activities at the benzodiazepine recognition site on the brain's receptor complex. Unfortunately, if the patient is dually-addicted to heroin and benzodiazepines, such as Zanax, Halcion, or Valium, the use of flumazenil to reverse the effects of benzodiazepine anesthesia can cause seizures.

In a 1993 Spanish survey of 973 heroin addicts, 68% of the patients admitted to using benzodiazepines, and 43% admitted to using them on a daily basis. It has been observed that heroin-dependent patients often use benzodiazepines in the days and weeks prior to seeking treatment to help them sleep when they are trying to cut down on their own. These reported figures are believed to be conservative since addicts have no trouble concealing their benzodiazepine use from their treating physician, even when provided with a warning of adverse side effects.

The duration of action for flumazenil may also not be sufficient to eliminate the effects of benzodiazepines which are still present in the patient's blood and bile. This can lead to resedation, and requires extended periods of observation. Of course, extended observation is usually associated with additional nights in a hospital and added expense.

Accordingly, there is a need for rapid opiate detoxification procedure which is safe for both opiate and dually-addicted patients. There is also a need for an effective detox therapy which can permit the swift discharge of ambulatory patients without latent anesthetic side effects.

## SUMMARY OF THE INVENTION

Methods of detoxifying patients addicted to opioids are provided by this invention. In the preferred method, the patient is first sedated with a rapid-acting, anesthetic agent having a recovery period of no greater than about 20 minutes, after which said patient is fully awake. The patient is then intubated in order to minimize aspiration, and ventilated to provide oxygen during sedation. The patient is next paralyzed with a neuromuscular blocking agent which cuts down on motor function, permits a reduced dose of anesthetic agent, and decreases the chance of vomiting. The patient is then detoxified by injecting an aggressive opioid antagonist, preferably at least naloxone hydrochloride. Once the patient has been fully detoxified, he or she is quickly and permanently revived from the effects of the anesthetic or neuromuscular blocking agents and then extubated prior to being discharged within a total of about eight hours after initiating therapy.

The detoxification procedures of this invention can be accomplished without requiring an overnight stay at a hospital. The detoxification is preferably accomplished within about three or four hours, while the patient is asleep.

The present invention is a vast improvement over existing ROD procedures which use barbiturates as the lone sedative. The preferred anesthetic agent of this invention, propofol, effectively reduces the symptoms of opiate withdrawal without significant accumulation by the patient's tissues, or the re-introduction of partially metabolized sedative in the patient's blood and bile. Thus, patients detoxified with the procedures of this invention need not be monitored for extended periods of time after they are awake and will have a quick recovery period shortly after terminating the preferred propofol drip.

This invention is also much better than techniques relying solely upon benzodiazepine anesthetics. Propofol controls more of the withdrawal symptoms than benzodiazepines, and the present procedure presents a much lower risk of aspiration than when benzodiazepines are employed. Moreover, eliminating the sedative effects of propofol can be safely accomplished by terminating the intravenous drip, which permits the patient to be fully ambulatory within minutes. Benzodiazepines usually require the introduction of a benzodiazepine receptor antagonist, such as flumazenil, for reversal. Generally, flumazenil doses of approximately 0.421 mg usually produce antagonism in patients who have received the usual sedating doses of benzodiazepines. The onset of reversal is usually evident within one to two minutes after the injection is completed, but resedation, as explained above, is a lingering problem. Despite the quick-initiation of reversibility of benzodiazepines with flumazenil, this chemical reversibility has also been associated with the occurrence of seizures. Such seizures are most frequent in patients who have been on benzodiazepines to help kick their opiate habits. Reversing the sedation effects of propofol are completely without this risk.

In another preferred embodiment of this invention, an opioid detoxification therapy is provided for patients who are dually-addicted to opiates and benzodiazepines, for example, heroin and valium. The patient is first sedated using a rapid-acting intravenous, anesthetic agent, preferably propofol. Following sedation, the patient is administered a narcotic antagonist containing naloxone hydrochloride to induce withdrawal. After withdrawal has been complete, which can be confirmed with a test dosage of naloxone, the patient can be revived by at least terminating the intravenous delivery of the anesthetic agent.

## Definitions

naloxone hydrochloride: 1-N-Allyl-7,8-dihydro-14-hydroxymorphinone hydrochloride; a potent antagonist of endorphins and narcotics, including pentazocine; devoid of pharmacologic action when administered without narcotics.

naltrexone: 17-(Cyclopropylmethyl)-4, 5-epoxy-3, 14-dihydroxymorphinan-6-one; an orally active narcotic antagonist; devoid of pharmacologic action when administered in the absence of narcotics.

propofol: an oil-in-water emulsion of 1, 6-diisopropylphenol, a hypnotic with rapid onset and short duration of action; used intravenously for induction and maintenance of general anesthesia. Also called 2, 6-diisopropyl phenol.

opioid: opiates, synthetic narcotics, alcohol, cocaine, cannabis, and other mood-altering substances.

opiate: any preparation or derivative of opium, including heroin.

## A DETAILED DESCRIPTION OF THE INVENTION

The present invention provides for rapid detoxification of opioid addicts, including those who are dually-addicted to opiates and benzodiazepines.

An outline of the preferred therapy will now be described as an overview. At the initial office visit, a staff member conducts a biopsychosocial interview. At this time, the procedure is explained in depth along with a description of what to expect after detoxification is complete. The importance of group therapy and a support person following therapy is explained to the patient.

A complete history and physical examination is conducted, with a particular attention directed to prior difficulties with anesthesia on the part of the patient or his or her family. In addition, the arms and legs of the patient should be inspected for adequate venous access. An informed consent form is reviewed and executed, and warnings are given concerning what the patient should expect from the procedure.

The sedation procedure preferably involves the use of a rapid sequence induction of anesthesia, in combination with a rapid-acting, intravenous anesthetic agent. Propofol is a preferred rapid-acting intravenous anesthetic agent. Propofol has a half-time of the blood-brain equilibriation of about one to three minutes. Additionally, propofol is known to reverse its effects within minutes. Discontinuation of recommended doses of propofol injection after the maintenance of anesthesia for approximately 1–10 hours results in a prompt decrease in blood propofol concentrations and rapid awakening in less than 20 minutes, and usually within about 10–15 minutes. This is a drastic improvement over barbiturate anesthesia which is known to take hours for complete reversal.

In addition to the induction and sedation agents, the patient is preferably administered a dose of curare and succinylcholine, an effective, inexpensive paralytic agent commonly used in an induction. Paralysis is desirable since it significantly decreases the incidence of vomiting, however, this requires ventilation since it is necessary to breathe for the patient. After paralysis is induced, it can be maintained with pavulon or norcuron until the therapy is complete.

The patient should also be intubated for protecting the airway. When inducing withdrawal in a patient, particularly a severe withdrawal through the use of a narcotic antagonist, vomiting is a frequent side effect. In order to prevent aspiration of this vomitus, with possible life-threatening consequences, a tube can be placed in the airway with an inflated cuff.

After the patient has been intubated and ventilated, a preferred propofol drip is initiated intravenously. The effects of this intravenous anesthetic agent can be completely eliminated merely by discontinuing its administration. This sedative is also safe to use with dually-addicted patients, such as those that have both heroin and benzodiazepine addiction. In the event that adverse pulmonary or respiratory effects occur during detoxification, the patient can be revived nearly immediately. This is not the case with conventional ROD procedures.



In addition to intubation, a nasogastric tube should be inserted into the stomach cavity of the sedated patient. This allows for the insertion of naltrexone, an oral pure narcotic antagonist during the procedure. It also permits the evacuation of the stomach at any time during the procedure, which tends to lessen the production of vomitus should the person regurgitate.

Following sedation and paralysis, the patient is administered an IV of naloxone initially in a dose of at least about 0.4 mgs. This basically initiates withdrawal, typically exhibited by piloerection and a transient elevation of blood pressure. It acts rapidly and is short-acting. The abstinence syndrome can be seen immediately, and if any complications arise, the procedure can be abandoned in its early phase.

After withdrawal initiates, the naloxone dosage can be increased to about 12 mgs intravenously, or a smaller dose of a stronger or longer-acting antagonist, such as nalmefene or naltrexone can be administered. This large dose will rapidly strip all of the receptors of opiates.

At about three or four hours, the patient should be fully detoxed, and a maintenance dose of opiate antagonist can be administered. This can be made through oral therapy, for example, by naltrexone, or alternatively, as a subcutaneous injection, implantation or insertion under the skin of the patient with a time-released antagonist-carrier mixture. Preferred carriers could include starch, cellulose or polymeric substances. Such materials should be biodegradable within the human body, and can include, for example, rod-shaped, injectable time-released naltrexone dosages combined with a water soluble glass, or a polymer, such as cross-linked polysiloxane copolymers, ethylene-vinyl acetate, and polyurethanes. See U.S. Pat. Nos. 5,141,748; 5,088,505; 4,957,119 and 3,887,699, which are hereby incorporated by reference. Such compositions can also include time-release agents, erosion rate modifiers, antimicrobial agents and surfactants. Alternatively, a mechanical device may be used to create a time-lapsed delivery of the preferred long-acting antagonist substances.

The antagonist maintenance therapy preferably continues to release a minimum therapeutic dose at least once every three days, at least for one week following the procedure. This dose should eliminate the mood-altering effects of any opiate that the patient takes, and will help to maintain sobriety while the patient seeks counseling.

The stomach may be evacuated to avoid any vomiting upon awakening the patient. Additional medications, such as cholesteramine or potassium, can be injected to decrease diarrhea or correct electrolyte imbalances. Paralysis is reversed with a known regiment of a paralytic agent antagonist, and the propofol drip is terminated.

Further specific details of the therapy will now be described in the following example.

## EXAMPLE

The patient disrobes and is placed in a hospital bed. A certified registered nurse anesthetist is introduced and reviews the pertinent anesthesia questions with the patient. IV access is established in a peripheral vein with one liter of lactated ringers solution. All subsequent medications will be administered through the intravenous tubing, minimizing needle sticks. A small amount of local anesthetic agent is administered intravenously. The patient is administered 2–3 mg of propofol for the purpose of relaxation. The patient is connected to blood pressure, pulse, pulse oximeter, respiratory, EKG, and end-expiratory $CO_2$ monitoring. (Defibrillator and all emergency drugs are immediately available).

The physician is present throughout the induction and administration of pure narcotic antagonists which is performed in conjunction with the CRNA. A propofol infusion is prepared and accessed to the patient (50 ml vial of 10 mg per ml). Strict aseptic precautions are observed in preparation. A bolus injection of propofol (20 ml via of 10 mg per ml) is prepared and a dose of 2 mg per kg is injected. Simultaneously, the propofol drip is commenced at 100 micrograms per kg per minute (6 mg per kg per hour). The patient is ventilated, intubated and placed on the ventilator. Cricoid pressure is applied during the intubation. Vital signs are recorded every five minutes during induction of anesthesia and every 30 minutes thereafter for the remainder of the procedure. Pavulon 0.1 mg per kg bolus is injected initiating neuromuscular blockade. This facilitates ventilation and prevents vomiting. The patient is then administered Glycopyrrolate 2 mg IV. This atropine-like medication decreases the marked secretions that patients typically produce during withdrawal. An orogastric tube is then placed and the stomach is evacuated. The patient is administered naloxone 0.4 mg IV and observed for signs of withdrawal, i.e., piloerection and increased blood pressure.

Naloxone is used due to its short half-life. It will initiate the withdrawal sufficiently and still allow an opportunity to abandon the procedure even at this point.

The patient is then administered nalmefene 2 mg IV. This drug occupies approximately 50% more of the receptor sites than naloxone and has a longer half-life (10.8 hours).

The patient is then administered naltrexone 50 to 200 mg via the orogastric tube. This initiates the oral therapy with a long-acting agent. Neuromuscular blockade is maintained with norcuron 0.08 to 0.1 mg per kg based upon the patient's response to peripheral nerve stimulation. After three hours, the stomach is again evacuated. Cholestyramine 8 mg is then administered via the orogastric tube. This is for the prevention of diarrhea. At the end of the procedure, approximately 3.5 hours after the induction, the propofol drip is discontinued. The neuromuscular blockage is reversed with neostigmine 2.5 mg and atropine 1 mg IV bolus. This will also decrease abdominal discomfort after the procedure.

The patient is extubated after the following criteria are met: (a) train of four on peripheral nerve stimulation, (b) swallowing, (c) responds appropriately to verbal stimuli, and (d) sustained head lift of six seconds. The OG tube is removed with the endotracheal tube. A medical alert bracelet or necklace is applied to the patient. After about one hour of observation, within which the patient is assisted in getting dressed, he or she is then assisted out to the car. The physician is present at the termination of the procedure and during extubation.

In the post-procedure phase, the patient is very tired, weak and lethargic, and sleep may appear restless accompanied by extensive yawning. Leg and back pains are usually minimal and are relieved by either hot baths or wet/hot compresses. It is essential that the patient take the naltrexone at least once a day, at least for the first week after the procedure. Instructions are again reviewed with the caretaker. Those instructions include what to expect in the post-procedure phase. The caretaker is instructed to call the doctor upon arriving home. The caretaker is provided with the following: 12 capsules containing phenobarbital 250 mg with clonidine 0.25 mg (these medications are administered for the relief of nausea, vomiting, abdominal cramps and insomnia as directed by the physician); one rectal suppository containing phenobarbital 500 mg with clonidine 0.5 mg; and a prescription for naltrexone 50 mg to be taken one daily, dispense 30. The caretaker is instructed to contact the physician upon arrival at home. Contact is then made by telephone between the caretaker and the physician according to the following schedule: every two to three hours on the first day, and every six hours on the second day. Thereafter, contact is made between the patient and/or caretaker and the physician and/or a staff member daily for one week; then every three to four days for one week, followed bi-weekly for two weeks and periodically thereafter.

We give aggressive telephone support to encourage a connection between the patient and a 12-step recovery program. We try to give guidance in obtaining a sponsor and attempt to communicate with the patient's sponsor in order to help facilitate the transition to a support group. Follow-up office visits are scheduled at weekly intervals for two weeks, then bi-monthly for two months, then monthly and as needed thereafter. Again, this is primarily to facilitate the transition to a 12-step recovery program support structure.

From the foregoing, it can be realized this invention provides improved ROD procedures capable of being safely reversed even in the instance where the patient is dually-addicted to benzodiazepines and heroin. The present invention preferably takes advantage of the fast-acting aesthetic ability of propofol, and uses other techniques, such as paralysis, in rendering the detoxification process almost completely without symptoms. Although various embodiments for these therapies have been illustrated, this was for the purpose of describing, but not limiting the invention. Various modifications, which will become apparent to one skilled in the art, fall within the scope of this invention described in the attached claims.

What is claimed is:

1. A method of detoxifying a patient addicted to one or more opioids, comprising:

sedating said patient, said sedating step comprising the administration of an a rapid acting, intravenous anesthetic agent having a recovery period, after termination of the administration of said anesthetic agent, of no greater than about twenty minutes;

intubating said patient in order to minimize aspiration of vomitus;

ventilating said patient for providing oxygen during said sedation;

paralyzing said patient with a neuromuscular blocking agent;

detoxifying said patient by injecting an opioid antagonist;

reviving said patient from the effects of said anesthetic and neuromuscular blocking agents;

extubating said patient; and

administering antagonist maintenance therapy to said patient by time-releasable subcutaneously implanted antagonist, wherein said steps of sedating, intubating, ventilating, paralyzing, detoxifying, reviving and extubating said patient are completed within about eight hours.

2. The method of claim 1 wherein said detoxifying step is completed within about four hours, and wherein said implanted antagonist comprises naltrexone.

3. The method of claim 1 wherein said anesthetic agent comprises 2,6-diisopropylphenol.

4. The method of claim 1 wherein said opioid antagonist comprises 17-allyl-4, 5 α epoxy-3, 14-dihydroxy-morphinan-6-one hydrochloride.

5. The method of claim 1 further comprising inserting a nasogastric tube within said patient for administering a longacting opiate antagonist.

6. The method of claim 2 wherein said reviving step comprises terminating said sedating step and chemically reversing said paralyzing step.

7. The method of claim 1 further comprising administering a long-acting opiate antagonist to said patient.

8. The method of claim 1 wherein said sedating step comprises administration of a bolus injection of an anesthetic agent and a subsequent propofol intravenous drip.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,004,962
DATED : December 21, 1999
INVENTOR(S) : Gooberman

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page, second column, first line above ABSTRACT, "Mentlirk" should be -- Mentlik --.

Column 2, line 46, cancel "30".
Column 8, line 35, cancel "step".
Column 8, line 36, cancel "an".
Column 8, line 43, "sedation" should be -- sedating --.
Column 8, line 52, cancel "steps of".
Column 8, line 56, cancel "step".
Column 8, line 66, "longacting" should be -- long-acting --.
Column 9, line 1, cancel "step".
Column 9, line 2, cancel "step".
Column 9, line 3, cancel "step".
Column 10, line 1, cancel "step".

Signed and Sealed this

Twenty-fourth Day of October, 2000

Attest:

Q. TODD DICKINSON

*Attesting Officer*

*Director of Patents and Trademarks*

# EXHIBIT B

US005789411A

# United States Patent [19]

Gooberman et al.

[11] Patent Number: 5,789,411

[45] Date of Patent: Aug. 4, 1998

[54] IMPROVEMENTS TO RAPID OPIOID DETOXIFICATION

[75] Inventors: Lance L. Gooberman, Haddonfield, N.J.; Colin Brewer, London, United Kingdom

[73] Assignee: Lance L. Gooberman P. C., Centerville, N.J.

[21] Appl. No.: 660,528

[22] Filed: Jun. 17, 1996

Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 526,429, Sep. 11, 1995.

[51] Int. Cl.$^6$ ........................ A61K 31/44; A61K 31/495

[52] U.S. Cl. ......................... 514/255; 514/282; 514/812

[58] Field of Search ................................. 514/255, 282, 514/812

[56] References Cited

U.S. PATENT DOCUMENTS

5,272,149 12/1993 Stalling ................................ 514/255

OTHER PUBLICATIONS

Alim, T.N. et al., "Tolerability Study of a Depot Study Form of Naltrexone Substance Abusers", *Problems of Drug Dependence, 1994: Proceedimgs of the 56th Annual Scientific Meeting, The College on Problems of Drug Dependence, Inc.*, vol. II: Abstracts, NIDA Research Monograph 153, p. 253, U.S. Department of Health and Human Services, National Institute on Drug Abuse, Rockville, MD, 1995.

Chiang, C.N. et al., "Kinetics of a Naltrexone Sustained-Release Preparation", *Clin. Pharmacol. Ther.*, vol. 36, No. 5, pp. 704–708, Nov. 1984.

Wall, Monroe E. et al., "Metabolism and Disposition of Naltrexone in Man After Oral and Intravenous Administration", *Metabolism and Disposition*, vol. 9, No. 4, pp. 369–375, 1981.

Renault, Pierre F., "Treatment of Heroin-Dependent Persons With Antagonists: Current Status", *Naltrexone: Research Monograph 28*, pp. 11–22, National Institute on Drug Abuse, 1980.

Wall, Monroe E. et al., "Naltrexone Disposition in Man After Subcutaneous Administration", *Metabolism and Disposition*, vol. 12, No. 6, pp. 677, 679, & 682, 1984.

Reuning, R.H. et al., "Pharmacokinetic Quantitation of Naltrexone Controlled Release From a Copolymer Delivery System", *Journal of Pharmacokinetics and Biopharmaceutics*, vol. 11, No. 4, pp. 369–387, Plenum Publishing Corporation, 1983.

Sharon, A. Carl et al., "Development of Drug Delivery Systems for Use in Treatment of Narcotic Addiction", *Naltrexone: Research Monograph 28*, pp. 194–213, National Institute On Drug Abuse, 1980.

Misra, Anand L., "Current Status of Preclinical Research on Disposition, Pharmacokinetics, and Metabolism of Naltrexone", *Naltrexone: Research Monograph 28*, pp. 132–146, National Institute on Drug Abuse, 1980.

Harrigan, Stephen E., "Pharmacological Evaluation of Narcotic Antagonist Delivery Systems in Rhesus Monkeys", *Naltrexone: Research Monograph 28*, pp. 77–92, National Institute on Drug Abuse, 1980.

Affidavit of Juan Jose Legarda, 1995.

Affidavit of Norbert Loimer, 1995.

Forrester-Sigma, Patrick et al., "A New Assault On Addiction", *Newsweek*, Jan. 30, 1995.

Loimer, Norbert et al., "Combined Naloxone/Methadone Preparations for Opiate Substitution Therapy", *Journal of Substance Abuse Treatment*, vol. 8, pp. 157–160, 1991.

Loimer, Norbert et al., "Similar Efficacy of Abrupt and Gradual Opiate Detoxification", *American Journal of Drug and Alcohol Abuse*, 17(3), pp. 307–312, 1991.

Bastin, Richard, "New drug cure gives addicts painless cold turkey", Reuters, Limited, 1994.

Abstract of O'Connor, PG et al., "Ambulatory opiate detoxification and primary care", *J. Gen. Intern. Med.*, 7(5) : 532–4, Sep.–Oct. 1992.

Abstract of Senft, RA, "Experience with clonidine-naltrexone for rapid opiate detoxification", *J. Subst. Abuse Treat.*, 8(4); 257–9, 1991.

Abstract of Fraser, AD, "Clinical toxicology of drugs used in the treatment of opiate dependency", *Clin. Lab. Med.*, 10(2):375–86, Jun. 1990.

Nutt, David J., "Pharmacological Mechanism of Benzodiazepine Withdrawal", The Reckitt and Colman Psycopharmacology Unit, The Medical School, Bristol, England, undated.

Article entitled "Is RO 15-4513 A Specific Alcohol Antagonist", undated.

Jordan, C. et al., Respiratory Depression Following Diazepam: (Reversal with High-Dose Naloxone), *The American Society of Anesthesiologists, Inc.*, 53:293–298, 1980.

Loimer, Norbert et al., "Technique for Greatly Shortening The Transition From Methadone To Naltrexone Maintenance of Patients Addicted to Opiates", *American Journal of Psychiatry*, Clinical and Research Reports 148–7, pp. 993–935, Jul. 1991.

Loimer, N. et al., "Continuous Naloxone Administration Suppresses Opiate Withdrawal Symptoms in Human Opiate Addicts During Detoxification Treatment", *Journal of Psychiatry*, Res. vol. 23, No. 1, pp. 81–86, 1989.

Eisenberg, Richard, "Effects of Chronic Treatment with Diazepam, Phenobarbital, Or Amphetamine on Naloxone-Precipitated Morphine Withdrawal", *Drug and Alcohol Dependence*, 15, pp. 375–381, 1985.

(List continued on next page.)

*Primary Examiner*—James H. Reamer
*Attorney, Agent, or Firm*—Duane, Morris & Heckscher LLP

[57] ABSTRACT

Rapid opioid detoxification procedures are provided which include sedating a patient with an anesthetic agent having a short full recovery period. The patient is administered an opioid antagonist while sedated and can be revived to an ambulatory condition within eight hours of initiating therapy. The described methods for detoxification also include administering a diarrhea suppressant, such as octreotide acetate, to limit this unfortunate side effect of the detoxification.

29 Claims, No Drawings

OTHER PUBLICATIONS

Presslich, Otto et al., "Opiate Detoxification Under General Anesthesia By Large Doses of Naloxone", *Clinical Toxicology*, 27(4&5), pp. 263–270, 1989.
Abstract of U.S. Patent No. 5,173,287 to Smith.
Abstract of U.S. Patent No. 5,075,341 to Mendelson et al.
Abstract of U.S. Patent No. 5,069,909 to Roos et al.
Abstract of U.S. Patent No. 5,389,670 to Fontana.
Abstract of U.S. Patent No. 5,370,681 to Herweck.
Abstract of U.S. Patent No. 5,316,938 to Keen et al.
Abstract of U.S. Patent No. 5,288,488 to Backman et al.
Abstract of U.S. Patent No. 5,286,718 to Elliott.
Abstract of U.S Patent No. 5,268,463 to Jefferson.
Abstract of U.S. Patent No. 5,243,094 to Borg.
Abstract of U.S. Patent No. 5,223,605 to Fanslow et al.
Abstract of U.S. Patent No. 5,212,072 to Blalock et al.
Abstract of U.S. Patent No. 5,189,064 to Blum et al.
Abstract of U.S. Patent No. 5,173,486 to Monkovic et al.
Abstract of U.S. Patent No. 5,137,712 to Kask et al.
Abstract of U.S. Patent No. 5,128,145 to Edgren et al.
Abstract of U.S. Patent No. 5,120,543 to Hagin et al.
Abstract of U.S. Patent No. 5,110,364 to Mazur et al.
Abstract of U.S. Patent No. 5,108,927 to Dorn.
Abstract of U.S. Patent No. 5,091,180 to Walker et al.
Abstract of U.S. Patent No. 5,084,377 to Rowan.
Abstract of U.S. Patent No. 5,077,195 to Blalock et al.
Abstract of U.S. Patent No. 5,070,014 to Dorn.
Abstract of U.S. Patent No. 5,057,321 to Edgren et al.
Abstract of U.S. Patent No. 5,043,163 to Pap et al.
Abstract of U.S. Patent No. 5,034,416 to Smith.
Abstract of U.S. Patent No. 5,026,728 to Kendall et al.
Abstract of U.S. Patent No. 5,021,236 to Gries et al.
Abstract of U.S. Patent No. 5,013,539 to Morris et al.
Abstract of U.S. Patent No. 4,997,454 to Violante et al.
Abstract of U.S. Patent No. 4,952,376 to Peterson.
Abstract of U.S. Patent No. 4,935,428 to Lewis.
Abstract of U.S. Patent No. 4,920,044 to Bretan, Jr.
Abstract of U.S. Patent No. 4,897,246 to Peterson.
Jeffrey, Glenn, "Rapid Opioid Detox with Naltrexone: Its Evolution, Its Neurophysiology and Further Pharmacologic Considerations", pp. 1–51, Cornell University Medical Center, undated.
Legarda, Juan Jose, "A Twenty–four Inpatient Detoxification Treatment for Heroin Addicts: A Preliminary Investigation", *Drug and Alcohol Dependence*, 35, pp. 91–93, 1994.
Letter from Eva Clifton to Lance Gooberman dated May 13, 1995.
Trade Literature from Krakauers Ltd. dated May 14, 1995.

# IMPROVEMENTS TO RAPID OPIOID DETOXIFICATION

## RELATED APPLICATIONS

This application is a continuation-in-part application of U.S. patent application Ser. No. 08/526,429, dated Sep. 11, 1995 now pending, and entitled "Rapid Opioid Detoxification."

## FIELD OF THE INVENTION

This invention relates to methods of rapidly detoxifying opioid addicts so as to relieve conscious symptoms, and more particularly, to methods of detoxification employing sedation and a narcotic antagonist while permitting the patient to be ambulatory within eight hours of beginning treatment.

## BACKGROUND OF THE INVENTION

Heroin addiction is a growing healthcare problem in the United States. The United States Department of Health and Human Services' Substance Abuse Branch issued a report in December of 1994 stating that the number of emergency department visits directly related to heroin use rose from 48,000 in 1992 to 63,000 in 1993, a 31% increase. The rate of heroin-related episodes per 100,000 people rose 81%, from 15 to 28 per 100,000, between 1990 and 1993. Upon breaking down the heroin-using population into ethnic groups and age groups, it has been demonstrated that all subsets have increased rates of use for this time period.

Human opiate detoxification has been in use for some time. More than 31,000 individuals of the Empire Blue Cross and Blue Shield subscriber base in New York were hospitalized at least once for opiate dependency between 1982 and 1992. The majority of these individuals were working adults, and their principal reason for hospitalization was addiction treatment. Drug detoxification accounted for 96% of the admissions, and the length of stay ranged between five and ten days.

It is widely known that heroin addicts fear and loathe heroin detoxification. For the addict, withdrawal can be like having a massive panic attack, an acute case of Huntington's Chorea, a psychological shock syndrome, and a nasty flu, all rolled into one.

Even if we discount the less than warm reception by addicts, the current method of detoxifying an individual from opiates is flawed in several respects. First of all, it is extremely uncomfortable for individual patients. Second, it can take days, and even weeks, for treatment, and this treatment is very expensive when one considers the overall length of stay at a hospital. Third, it is not very effective. Early relapse is the rule rather than the exception.

In the 1980s, outpatient protocols were developed in an attempt to reduce expenses and to entice more addicts to receive treatment. In one particular therapy, a shortened five-day schedule was employed. On the first day, patients received a naloxone hydrochloride ("naloxone") challenge test at 9:00 a.m., using 0.8 mgs of naloxone, and then were started on clonidine hydrochloride ("clonidine") premedication. Clonidine is a potent antihypertensive agent and stimulates adrenergic receptors in the brain, leading to reduced sympathetic nervous system output. Daily averages of medication were, for day two: clonidine 1.1 mgs and naltrexone 8 mgs; day three: clonidine 0.6 mgs and naltrexone 40 mgs; day four: clonidine 0.3 mgs and naltrexone 50 mgs; and day five: clonidine 0.2 mgs and naltrexone 150 mgs.



In 1988, Loimer et al. described an inpatient technique in which 12 hours after the patient's last dose of opiate, they were sedated with 100 mgs of the barbiturate, methohexitone. This was followed by further injections of 400 mgs of methohexitone and 10 mgs of naloxone. After the narcotic effect had worn off, 2 mgs of naloxone was given intravenously about 30–40 minutes later. This did not elicit any further withdrawal response. This study showed that the acute onset of withdrawal symptoms induced by naloxone in opiate addicts is blocked by barbiturates.

Loimer et al. in 1991 described another inpatient, technique for enabling patients to transfer quickly from methadone to naltrexone maintenance. In a study of seven patients, they induced acute methadone detoxification by using a 4 mg bolus of intravenous naloxone ten minutes after intravenous sedation was started with 30 mgs of midazolam, a short-acting benzodiazepine. After the naloxone infusion was completed, the patients received repeated dosages of flumazenil, a benzodiazepine antagonist, until they were awake. Within hours, the patients tolerated full doses of naltrexone.

Loimer pointed out that conscious sedation with midazolam was safer than general anesthesia. The technique also suppressed withdrawal signs and symptoms. Loimer used intranasal naloxone to induct patients onto naltrexone.

Loimer further described in 1993 an inpatient technique using intranasal naloxone. Twenty opiate-dependent patients reported a mean daily heroin dose of 2.0 grams for at least 2 months prior to detoxification. Twelve hours after their last heroin use, all the patients were sedated with 60 mgs of oral midazolam. Simultaneously, they received 0.3 mgs of clonidine and 5.0 mgs of ondansetron (a selective 5-HT3 receptor antagonist, generally used to prevent nausea and vomiting associated with cancer chemotherapy). Ten minutes later, oral naltrexone, 50 mgs, was administered. The patients typically were asleep fifteen minutes post-midazolam, at which time withdrawal was precipitated by 4 mgs of naloxone administered nasally as a spray. Naltrexone, 50 mgs/day, was continued for the next 2 days before discharge.

Loimer has reported that none of his patients showed severe withdrawal distress before detoxification. He has found that following the administration of naloxone, withdrawal distress was significantly higher than baseline levels at 30, 45, 60 and 90 minutes, but that there were no significant differences from the baseline on all subsequent measurements. Furthermore, he has reported that systolic and diastolic blood pressure and heart rate did not change significantly during treatment.

Legarda and Gossop in 1994 also described an inpatient technique enabling heroin addicts to undergo a rapid transition to naltrexone maintenance, now referred to as rapid opiate detoxification. Legarda belongs to the CITA group, which has been detoxifying heroin patients in Spain, Israel and Mexico under general anesthesia.

As in Loimer et al.'s 1991 report, Legarda and Gossop used intravenous midazolam (0.5–0.7 mgs/kg initially, then as a constant infusion) for sedation. In this study, however, patients received an initial dose of oral naltrexone, 50 mgs, immediately prior to the injection of midazolam, and did not receive any naloxone reversal while under sedation.

They also pretreated the patients with repeated oral doses of guanfacine (like clonidine, a centrally acting agent with alpha-2 agonist properties) 1–2 mgs/hour. Oral doses of loperamide (4 mgs) and ondansetron (8 mgs) were given, to avoid diarrhea and vomiting during the detoxification procedure.

During the time they were sedated, the subjects' opiate withdrawal signs primarily were piloerection, sneezing and motor agitation.

Four hours after the sleep induction, the patients received a naloxone test (0.8 mgs IV), and then 12 hours later they received 50 mgs of naltrexone, both of which provoked no withdrawal responses.

While Dr. Loimer's initial barbiturate procedure has relieved patients of the conscious symptoms of withdrawal by administering general anesthesia simultaneously with a large continuous dose of a pure narcotic antagonist, he requires patients to be carefully monitored for 12 to 24 hours. This is because barbiturate anesthesia tends to accumulate and is not reversible, requiring patients to be watched for an extended period of time following the procedure. It also minimizes the options available to the physician if adverse conditions arise, such as severe respiratory suppression.

The use of the benzodiazepines, such as midazalom is completely reversible by antagonists such as flumazenil, an imidazobenzodiazepine derivative. Flumazenil competitively inhibits the activities at the benzodiazepine recognition site on the brain's receptor complex. Unfortunately, if the patient is dually-addicted to heroin and benzodiazepines, such as Zanax, Halcion, or Valium, the use of flumazenil to reverse the effects of benzodiazepine anesthesia can cause seizures.

In a 1993 Spanish survey of 973 heroin addicts, 68% of the patients admitted to using benzodiazepines, and 43% admitted to using them on a daily basis. It has been observed that heroin-dependent patients often use benzodiazepines in the days and weeks prior to seeking treatment to help them sleep when they are trying to cut down on their own. These reported figures are believed to be conservative since addicts have no trouble concealing their benzodiazepine use from their treating physician, even when provided with a warning of adverse side effects.

The duration of action for flumazenil may also not be sufficient to eliminate the effects of benzodiazepines which are still present in the patient's blood and bile. This can lead to resedation, and requires extended periods of observation. Of course, extended observation is usually associated with additional nights in a hospital and added expense.

Another recent problem that has developed in detoxifying heroin addicts is the occurrence of profuse diarrhea in patients during withdrawal. The problem becomes even more severe when patients are sedated during the procedure, since they have no bowel control.

## SUMMARY OF THE INVENTION

Methods of detoxifying patients addicted to one or more opioids are provided by this invention. The methods include sedating the patient with an anesthetic agent, ventilating the sedated patient, administering a diarrhea suppressant to the patient and then detoxifying the patient by injecting an opioid antagonist. The patient is then revived from the effects of the anesthetic and discharged in an ambulatory condition within about eight hours of being sedated. Diarrhea is significantly controlled, preferably with the addition of octreotide acetate solution.

## DEFINITIONS

naloxone hydrochloride: 1-N-Allyl-7,8-dihydro-14-hydroxymorphinone hydrochloride; a potent antagonist of endorphins and narcotics, including pentazocine; devoid of pharmacologic action when administered without narcotics.

naltrexone: 17-(Cyclopropylmethyl)-4, 5-epoxy-3, 14-dihydroxymorphinan-6-one; an orally active narcotic antagonist; devoid of pharmacologic action when administered in the absence of narcotics.

propofol: an oil-in-water emulsion of 1, 6-diisopropylphenol, a hypnotic with rapid onset and short duration of action; used intravenously for induction and maintenance of general anesthesia. Also called 2, 6-diisopropyl phenol.

octreotide acetate: L-Cysteinamide, D-phenylalanyl-L-cysteinyl-L-phenylalanyl-D-tryptophyl L-lysyl-L-threonyl-N-[2 hydroxy-I-(hydroxy-methyl) propyl]-, cyclic (2-7)-disulfide; 2[R-(R*,R*)] acetate salt, is a long-acting octapeptide with pharmacologic actions mimicking those of the natural hormone somatostatin. It is commercially available as Sandostatin® octreotide acetate injection, a cyclic octapeptide prepared as a clear sterile solution of octreotide, acetate salt, in buffered sodium chloride for administration by deep subcutaneous (intrafat) or intravenous injection.

opioid: opiates, synthetic narcotics.

opiate: any preparation or derivative of opium, including heroin.

## A DETAILED DESCRIPTION OF THE INVENTION

The present invention provides for rapid detoxification of opioid addicts, including those who are dually-addicted to opiates and benzodiazepines.

An outline of the preferred therapy will now be described as an overview. At the initial office visit, a staff member conducts a biopsychosocial interview. At this time, the procedure is explained in depth along with a description of what to expect after detoxification is complete. The importance of group therapy and a support person following therapy is explained to the patient.

A complete history and physical examination is conducted, with a particular attention directed to prior difficulties with anesthesia on the part of the patient or his or her family. In addition, the arms and legs of the patient should be inspected for adequate venous access. An informed consent form is reviewed and executed, and warnings are given concerning what the patient should expect from the procedure.

The sedation procedure preferably involves the use of a rapid sequence induction of anesthesia, in combination with a rapid-acting, intravenous anesthetic agent. Propofol is a preferred rapid-acting intravenous anesthetic agent. Propofol has a half-time of the blood-brain equilibration of about one to three minutes. Additionally, propofol is known to reverse its effects within minutes. Discontinuation of recommended doses of propofol injection after the maintenance of anesthesia for approximately 1–10 hours results in a prompt decrease in blood propofol concentrations and rapid awakening in less than 20 minutes, and usually within about 10–15 minutes. This is a drastic improvement over barbiturate anesthesia which is known to take hours for complete reversal.

In addition to the induction and sedation agents, the patient is preferably administered a dose of curare and succinylcholine, an effective, inexpensive paralytic agent commonly used in an induction. Paralysis is desirable since it significantly decreases the incidence of vomiting, however, this requires ventilation since it is necessary to breathe for the patient. After paralysis is induced, it can be maintained with pavulon or norcuron until the therapy is complete.

The patient should also be intubated for protecting the airway. When inducing withdrawal in a patient, particularly a severe withdrawal through the use of a narcotic antagonist, vomiting is a frequent side effect. In order to prevent aspiration of this vomitus, with possible life-threatening consequences, a tube can be placed in the airway with an inflated cuff.

After the patient has been intubated and ventilated, a preferred propofol drip is initiated intravenously. The effects of this intravenous anesthetic agent can be completely eliminated merely by discontinuing its administration. This sedative is also safe to use with dually-addicted patients, such as those that have both heroin and benzodiazepine addiction. In the event that adverse pulmonary or respiratory effects occur during detoxification, the patient can be revived nearly immediately. This is not the case with conventional ROD procedures.

In addition to intubation, a nasogastric tube should be inserted into the stomach cavity of the sedated patient. This allows for the insertion of naltrexone, an oral pure narcotic antagonist during the procedure. It also permits the evacuation of the stomach at any time during the procedure, which tends to lessen the production of vomitus should the person regurgitate.

Following sedation and paralysis, the patient is administered an IV of naloxone initially in a dose of at least about 0.4 mgs. This basically initiates withdrawal, typically exhibited by piloerection and a transient elevation of blood pressure. It acts rapidly and is short-acting. Pharmacological antagonism occurs immediately. Evidence of the abstinence syndrome can sometimes be seen, and if any complications arise, the procedure can be abandoned in its early phase.

After withdrawal initiates, the naloxone dosage can be increased to about 12 mgs intravenously, or a smaller dose of a stronger or longer-acting antagonist, such as nalmefene or naltrexone can be administered. This large dose will rapidly strip all of the receptors of opiates.

At about three or four hours, the patient should be fully detoxed, and a maintenance dose of opiate antagonist can be administered. This can be made through oral therapy, for example, by naltrexone, or alternatively, as a subcutaneous injection, implantation or insertion under the skin of the patient with a time-released antagonist-carrier mixture. Preferred carriers could include starch, cellulose or polymeric substances. Such materials should be biodegradable within the human body, and can include, for example, rod-shaped, injectable time-released naltrexone dosages combined with a water soluble glass, or a polymer, such as cross-linked polysiloxane copolymers, ethylene-vinyl acetate, and polyurethanes. See U.S. Pat. Nos. 5,141,748; 5,088,505; 4,957,119 and 3,887,699, which are hereby incorporated by reference. Such compositions can also include time-release agents, erosion rate modifiers, antimicrobial agents and surfactants. Alternatively, a mechanical device may be used to create a time-lapsed delivery of the preferred long-acting antagonist substances.

The antagonist maintenance therapy preferably continues to release a minimum therapeutic dose at least once every three days, at least for one week following the procedure. This dose should eliminate the mood-altering effects of any opiate that the patient takes, and will help to maintain sobriety while the patient seeks counseling.

The stomach may be evacuated to avoid any vomiting upon awakening the patient. Additional medications, such as cholestyramine or potassium, can be injected to decrease diarrhea or correct electrolyte imbalances. Paralysis is reversed with a known regiment of a paralytic agent antagonist, and the propofol drip is terminated.

Further specific details of the therapy will now be described in the following example.

## EXAMPLE I

The patient disrobes and is placed in a hospital bed. A certified registered nurse anesthetist is introduced and reviews the pertinent anesthesia questions with the patient. IV access is established in a peripheral vein with one liter of lactated ringers solution. All subsequent medications will be administered through the intravenous tubing, minimizing needle sticks. A small amount of local anesthetic agent is administered intravenously. The patient is administered 2–3 mg of propofol for the purpose of relaxation. The patient is connected to blood pressure, pulse, pulse oximeter, respiratory, EKG, and end-expiratory $CO_2$ monitoring. (Defibrillator and all emergency drugs are immediately available).

The physician is present throughout the induction and administration of pure narcotic antagonists which is performed in conjunction with the CRNA. A propofol infusion is prepared and accessed to the patient (50 ml vial of 10 mg per ml). Strict aseptic precautions are observed in preparation. A bolus injection of propofol (20 ml via of 10 mg per ml) is prepared and a dose of 2 mg per kg is injected. Simultaneously, the propofol drip is commenced at 100 micrograms per kg per minute (6 mg per kg per hour). The patient is ventilated, intubated and placed on the ventilator. Cricoid pressure is applied during the intubation. Vital signs are recorded every five minutes during induction of anesthesia and every 30 minutes thereafter for the remainder of the procedure. Pavulon 0.1 mg per kg bolus is injected initiating neuromuscular blockade. This facilitates ventilation and prevents vomiting. The patient is then administered Glycopyrrolate 2 mg IV. This atropine-like medication decreases the marked secretions that patients typically produce during withdrawal. An orogastric tube is then placed and the stomach is evacuated. The patient is administered naloxone 0.4 mg IV and observed for signs of withdrawal, i.e., piloerection and increased blood pressure.

Naloxone is used due to its short half-life. It will initiate the withdrawal sufficiently and still allow an opportunity to abandon the procedure even at this point.

The patient is then administered nalmefene 2 mg IV. This drug occupies approximately 50% more of the receptor sites than naloxone and has a longer half-life (10.8 hours).

The patient is then administered naltrexone 50 to 200 mg via the orogastric tube. This initiates the oral therapy with a long-acting agent. Neuromuscular blockade is maintained with norcuron 0.08 to 0.1 mg per kg based upon the patient's response to peripheral nerve stimulation. After three hours, the stomach is again evacuated. Cholestyramine 8 mg is then administered via the orogastric tube. This is for the prevention of diarrhea. At the end of the procedure, approximately 3.5 hours after the induction, the propofol drip is discontinued. The neuromuscular blockage is reversed with neostigmine 2.5 mg and atropine 1 mg IV bolus. This will also decrease abdominal discomfort after the procedure.

The patient is extubated after the following criteria are met: (a) train of four on peripheral nerve stimulation, (b) swallowing, (c) responds appropriately to verbal stimuli, and (d) sustained head lift of six seconds. The OG tube is removed with the endotracheal tube. A medical alert bracelet or necklace is applied to the patient. After about one hour of observation, within which the patient is assisted in getting

dressed, he or she is then assisted out to the car. The physician is present at the termination of the procedure and during extubation.

In the post-procedure phase, the patient is very tired, weak and lethargic, and sleep may appear restless accompanied by extensive yawning. Leg and back pains are usually minimal and are relieved by either hot baths or wet/hot compresses. It is essential that the patient take the naltrexone at least once a day, at least for the first week after the procedure. Instructions are again reviewed with the caretaker. Those instructions include what to expect in the post-procedure phase. The caretaker is instructed to call the doctor upon arriving home. The caretaker is provided with the following: 12 capsules containing phenobarbital 250 mg with clonidine 0.25 mg (these medications are administered for the relief of nausea, vomiting, abdominal cramps and insomnia as directed by the physician); one rectal suppository containing phenobarbital 500 mg with clonidine 0.5 mg; and a prescription for naltrexone 50 mg to be taken one daily, dispense 30. The caretaker is instructed to contact the physician upon arrival at home. Contact is then made by telephone between the caretaker and the physician according to the following schedule: every two to three hours on the first day, and every six hours on the second day. Thereafter, contact is made between the patient and/or caretaker and the physician and/or a staff member daily for one week; then every three to four days for one week, followed bi-weekly for two weeks and periodically thereafter.

We give aggressive telephone support to encourage a connection between the patient and a 12-step recovery program. We try to give guidance in obtaining a sponsor and attempt to communicate with the patient's sponsor in order to help facilitate the transition to a support group. Follow-up office visits are scheduled at weekly intervals for two weeks, then bi-monthly for two months, then monthly and as needed thereafter. Again, this is primarily to facilitate the transition to a 12-step recovery program support structure.

## EXAMPLE II

The patient disrobes and is placed in a hospital bed, having received a Medical Alert insignia. A certified registered nurse anesthetist performs the pertinent anesthesia history and physical examination.

IV access is established in a peripheral vein with one liter of D5-1/2 lactated Ringers. All subsequent medications will be administered through the intravenous tubing, minimizing needle sticks. A small amount of local anesthetic agent is administered intravenously. The anesthetic agent, Propofol, tends to cause a burning sensation during initial administration and this minimizes discomfort for the patient. The patient is connected to blood pressure, pulse, pulse oximeter, respiratory, EKG, temperature and end-expiratory $CO_2$ monitoring. (Defibrillator and all emergency drugs are immediately available). Intravenous access is establish. The patient is administered 3–5 cc of 1% Lidocaine. This desensitizes the patient's vein prior to the administration of Propofol. The patient is administered 2 mg of Midazolam for its amnestic effect. The patient is administered 20–30 mg of Propofol for the purpose of relaxation and as a test dose. The physician is present throughout the induction and administration of pure narcotic antagonists which are performed in conjunction with the CRNA.

A Propofol infusion is prepared and accessed to the patient (50 ml vial of 10 mg per ml). Strict aseptic precautions are observed in preparation. A bolus injection of Propofol (20 ml vial of 10 mg per ml) is prepared and a dose of 2 mg per kg is injected. Simultaneously, the Propofol drip is commenced at 100 micrograms per kg per minute (6 mg per kg per hour). The patient is ventilated (pre-oxygenation with 100% O2), intubated and placed on the ventilator. Cricoid pressure is applied during the intubation. Vital signs are monitored continuously during intubation and throughout the remainder of the procedure. Pavulon 0.1 mg per kg bolus is injected initiating neuromuscular blockade after adequate airway and ventilation have been established. The patient is then administered Glycopyrrolate 0.2 mg IV. Odansetron 2 mg IV is added. This is an anti-emetic drug which ameliorates the vomiting frequently associated with withdrawal. An octreotide 200 micrograms IV is established. This alleviates the diarrhea and crampy abdominal pain associated with opiate withdrawal. The patient is then administered Naloxone 0.4 mg IV and observed for signs of withdrawal, i.e., piloerection and increased blood pressure. Naloxone is used due to its short half-life. It will initiate the withdrawal sufficiently and still allow an opportunity to abandon the procedure even after withdrawal begins. The patient is then administered Nalmefene 2 mg IV. This drug has a longer half-life (about 10.8 hours) than naloxone. It remains in effect while the oral Naltrexone is being absorbed. An oro-gastric tube is then placed and the stomach is evacuated. The patient is then administered Naltrexone (ReVia) 200 mg via the orogastric tube. This initiates the oral therapy with a long-acting agent. Neuromuscular blockade is maintained with Pavulon based upon the patient's response to peripheral nerve stimulation. After three hours, the stomach is again evacuated. The neuromuscular blockade is reversed with Neostigmine 2.5 mg and Atropine 1 mg IV bolus. At the end of the procedure, approximately 3 hours after the induction, the Propofol drip is discontinued.

The patient is extubated after the following criteria are met: (a) Train of four on peripheral nerve stimulation; (b) Responds appropriately to verbal stimuli; (c) Responds appropriately to verbal stimuli; and (d) Sustained head lift of six seconds. The OG tube is removed. The endotracheal tube is removed. The patient is assisted in getting dressed and out to the car. The physician is present during extubation at the end of the procedure. The patient is then observed for one hour prior to discharge.

In the post-procedure phase, the patient is very tired, weak and lethargic, and sleep may appear restless accompanied by extensive yawning. Leg and back pains are usually minimal and are relieved by either hot baths or hot wet compresses. It is essential that the patient take the Naltrexone (ReVia) at least once a day, at least for the first week after the procedure.

Instructions are again reviewed with the caretaker. Those instructions include what to expect in the post-procedure phase. Telephone numbers are exchanged and verified; these numbers include the physician's office number, beeper number and emergency number. The caretaker is instructed to call the doctor upon arriving home. The caretaker is provided with the following prescriptions: Naltrexone (ReVia) 50 mg to be taken one daily, dispense #30 and refill p.r.n. Clonidine 0.2 mg to be taken one every four hours, dispense #20 with one refill. Octreotide 200 micrograms per ml to be taken one cc subcutaneously q. 12 hours p.r.n. diarrhea; dispense #5 pre-filled syringes with needles. Refill times one.

The caretaker is instructed to contact the physician upon arrival at home. Contact is then made by telephone between the caretaker and the physician according to the following schedule: Every two to four hours on the first day. Every six to twelve hours on the second day. Thereafter, contact is

made between the patient and/or caretaker and a doctor or a staff member daily for one week; then every three to four days for one week, then weekly for two weeks and periodically thereafter. We give aggressive telephone support to encourage a connection between the patient and a 12-step recovery program. We try to give guidance in obtaining a sponsor and attempt to communicate with the patient's sponsor in order to help facilitate the transition to a support group.

Patients are evaluated according to the Short Opiate Withdrawal Scale (SOWS) by Michael Gossop during the recovery period, at 24 hours, and at 48 hours. Follow-up office visits are recommended for two weeks, then bi-monthly for two months, then monthly and as needed thereafter. Again, this is primarily to facilitate the transition to a 12-step recovery program support structure.

From the foregoing, it can be realized this invention provides improved rapid opiate detoxification procedures capable of being safely reversed even in the instance where the patient is dually-addicted to benzodiazepines and heroin. The present invention preferably takes advantage of the fast-acting aesthetic ability of propofol, and uses other techniques, such as paralysis, in rendering the detoxification process almost completely without symptoms. Although various embodiments for these therapies have been illustrated, this was for the purpose of describing, but not limiting the invention. Various modifications, which will become apparent to one skilled in the art, fall within the scope of this invention described in the attached claims.

What is claimed is:

1. A method of detoxifying a patient addicted to one or more opioids, comprising:

sedating said patient with an anesthetic agent;

administering to said patient a diarrhea suppressant;

detoxifying said patient by injecting an opioid antagonist into said patient;

reviving said patient from the effects of said anesthetic agents,

whereby said patient can be discharged in an ambulatory condition within about eight hours of being sedated with said anesthetic agent without a significant amount of diarrhea.

2. The method of claim 1 wherein said detoxifying step is accomplished within about four hours.

3. The method of claim 1 wherein said anesthetic agent comprises 2,6-diisopropylphenol.

4. The method of claim 1 wherein said opioid antagonist comprises 17-allyl-4, 5 α epoxy-3, 14-dihydroxymorphinan-6-one hydrochloride.

5. The method of claim 1 wherein said diarrhea suppressant comprises octreotide acetate.

6. The method of claim 5 further comprising intubating said patient in order to minimize aspiration of vomitus.

7. The method of claim 6 further comprising administering a long-acting opiate antagonist to said patient.

8. The method of claim 5 further comprising paralyzing said patient with a neuromuscular blocking agent.

9. An opioid detoxification therapy, comprising:

sedating a patient addicted to an opiate by administering a rapid acting intravenous, anesthetic agent;

administering a diarrhea suppressant containing an octapeptide with pharmacologic actions mimicking those of a natural hormone, somatostatin,

intravenously administering a narcotic antagonist containing naloxone hydrochloride to said patient while said patient is sedated to induce withdrawal;

and reviving said patient by at least terminating an intravenous delivery of said anesthetic agent, whereby said patient remembers little of a plurality of symptoms associated with said withdrawal and experiences little or no diarrhea.

10. The therapy of claim 9 wherein said narcotic antagonist comprises 17-allyl-4, 5 α epoxy-3, 14-dihydroxymorphinan-6-one hydrochloride.

11. The therapy of claim 9 further comprising mechanically ventilating said patient to provide oxygen during said sedating step.

12. The therapy of claim 11 further comprising paralyzing said patient with a neuromuscular blocking agent to minimize vomiting.

13. The therapy of claim 9 wherein said sedating step comprises administering 2, 6-diisopropylphenol.

14. The therapy of claim 13 wherein said administering step is accomplished within about 3 hours.

15. A narcotic detoxification therapy, comprising:

sedating a patient having an opioid addiction with 2,6-diisopropylphenol;

administering a diarrhea suppressant containing octreotide acetate;

intubating and mechanically ventilating said patient during said sedating step; and

intravenously administering naloxone hydrochloride to initiate opioid withdrawal in said patient, whereby said patient remembers little of a plurality of symptoms of said withdrawal and can be released within eight hours of beginning said therapy without experiencing significant diarrhea.

16. A method of detoxifying a patient addicted to one or more opioids, comprising:

sedating said patient with an anesthetic agent;

administering to said patient a diarrhea suppressant;

detoxifying said patient by injecting an opioid antagonist into said patient;

reviving said patient from the effects of said anesthetic agents,

whereby said patient can be discharged in an ambulatory condition within about eight hours of being sedated with said anesthetic agent without a significant amount of diarrhea; and

administering antagonist maintenance therapy to said patient by a time-releasable subcutaneously implanted antagonist.

17. The method of claim 16 wherein said detoxifying step is accomplished within about four hours, and said antagonist maintenance therapy is conducted with naltrexone to release a therapeutic dosage thereof for at least one week.

18. The method of claim 16 wherein said anesthetic agent comprises 2,6-diisopropylphenol.

19. The method of claim 16 wherein said opioid antagonist comprises 17-allyl-4, 5 α epoxy-3, 14-dihydroxymorphinan-6-one hydrochloride.

20. The method of claim 16 wherein said diarrhea suppressant comprises octreotide acetate.

21. The method of claim 20 further comprising intubating said patient in order to minimize aspiration of vomitus.

22. The method of claim 20 further comprising paralyzing said patient with a neuromuscular blocking agent.

23. An opioid detoxification therapy, comprising:

sedating a patient addicted to an opiate by administering a rapid acting intravenous, anesthetic agent;

administering a diarrhea suppressant containing an octapeptide with pharmacologic actions mimicking those of a natural hormone, somatostatin,

intravenously administering a narcotic antagonist containing naloxone hydrochloride to said patient while said patient is sedated to induce withdrawal;

and reviving said patient by at least terminating an intravenous delivery of said anesthetic agent, whereby said patient remembers little of a plurality of symptoms associated with said withdrawal and experiences little or no diarrhea; and

administering antagonist maintenance therapy to said patient by a time-releasable subcutaneously implanted antagonist.

**24**. The therapy of claim **23** wherein said narcotic antagonist comprises 17-allyl-4, 5 α epoxy-3, 14-dihydroxymorphinan-6-one hydrochloride.

**25**. The therapy of claim **23** further comprising mechanically ventilating said patient to provide oxygen during said sedating step.

**26**. The therapy of claim **25** further comprising paralyzing said patient with a neuromuscular blocking agent to minimize vomiting.

**27**. The therapy of claim **22** wherein said sedating step comprises administering 2, 6-diisopropylphenol.



**28**. The therapy of claim **27** wherein said administering step is accomplished within about 3 hours.

**29**. A narcotic detoxification therapy, comprising:

sedating a patient having an opioid addiction with 2,6-diisopropylphenol;

administering a diarrhea suppressant containing octreotide acetate;

intubating and mechanically ventilating said patient during said sedating step; and

intravenously administering naloxone hydrochloride to initiate opioid withdrawal in said patient, whereby said patient remembers little of a plurality of symptoms of said withdrawal and can be released within eight hours of beginning said therapy without experiencing significant diarrhea; and

followed by administering antagonist maintenance therapy to said patient by a time-releasable subcutaneously implanted antagonist.

* * * * *